DAWN SESTITO (S.B. #214011)
dsestito@omm.com
JONATHAN SCHNELLER (S.B. # 291288)
jschneller@omm.com
LAUREN KAPLAN (S.B. #294703)
lkaplan@omm.com
O'MELVENY & MYERS LLP
400 South Hope Street, 19th Floor
Los Angeles, California 90071-2899
Telephone:    (213) 430-6000
Facsimile:    (213) 430-6407

*Counsel for Plaintiff Exxon Mobil Corporation*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EXXON MOBIL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>LAUREN SANCHEZ, in her official capacity as Chair of the California Air Resources Board, STEVEN S. CLIFF, in his official capacity as the Executive Officer of the California Air Resources Board, MATTHEW BOTILL, in his official capacity as Division Chief of the Industrial Strategies Division of the California Air Resources Board, SYDNEY VERGIS, in her official capacity as Assistant Division Chief of the Industrial Strategies Division of the California Air Resources Board, and ROBERT A. BONTA, in his official capacity as Attorney General of California,<br><br>Defendants. | Case No.<br><br>**PLAINTIFF EXXON MOBIL CORPORATION'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.      California enacted two statutes that purport to require Exxon Mobil Corporation ("ExxonMobil") to serve as a mouthpiece for ideas with which it disagrees.  The goal is to "embarrass[]"[1] large corporations that California believes are uniquely responsible for climate change into "tak[ing] meaningful steps to reduce GHG emissions."  Senate Judiciary Committee, S.B. 253 (Wiener), at 12 (Apr. 18, 2023).  The statutes compel ExxonMobil to trumpet California's preferred message even though ExxonMobil believes the speech is misleading and misguided.  But the Constitution does not permit a State to use speech mandates to turn private parties into "instrument[s] for fostering public adherence to an ideological point of view [they] fin[d] unacceptable."  *Wooley v. Maynard*, 430 U.S. 705, 715 (1977).

2.      ExxonMobil has, for years, publicly disclosed its greenhouse gas emissions and climate-related business risks, and, to the best of its knowledge, no California official has ever suggested those disclosures are misleading or incomplete.  But it has not done so using the reporting frameworks California law would compel it to embrace.  In its public advocacy, ExxonMobil has consistently argued that those frameworks send the counterproductive message that large companies are uniquely responsible for climate change no matter how efficiently they satisfy societal demand for energy, goods, and services.  And the California statutes' legislative history shows that California seeks to force ExxonMobil to speak in service of that ideological premise, with one bill's sponsors unabashedly proclaiming that its aim is to make "the very corporations who are most responsible for the . . . climate crisis . . . own the responsibility to change their own practices."  Senate Judiciary Committee, S.B. 253 (Wiener), at 14 (Apr. 18, 2023).

3.      ExxonMobil understands the very real risks associated with climate change and supports continued efforts to address those risks.  But under the two statutes, California Senate Bill ("S.B.") 253 and 261, ExxonMobil will be forced to describe its emissions and climate-related risks in terms the company fundamentally disagrees with, using frameworks that place

---

[1] Remarks of Sen. Wiener, Sen. Env'l Quality Comm. Hearing on S.B. 253 (Mar. 15, 2023), *available at* http://tinyurl.com/yf66mbdn (at 2:23:37–2:23:47).

disproportionate blame on large companies like ExxonMobil for being large, for the avowed purpose of spurring public opprobrium and policy responses.  California may believe that companies that meet the statutes' revenue thresholds are uniquely responsible for climate change; but the First Amendment categorically bars it from forcing ExxonMobil to speak in service of that misguided viewpoint.

4.     S.B. 253 requires any company doing business in the State with annual revenues over $1 billion to "publicly disclose" its and certain third parties' worldwide greenhouse gas emissions across three categories or "Scopes," as estimated using the Greenhouse Gas Protocol standards and guidance ("GHG Protocol").  For years, ExxonMobil has disclosed its worldwide greenhouse gas emissions—and the guidelines it relies on to estimate them—in sustainability reports made available to the public.  In doing so, ExxonMobil has voiced disagreement with numerous aspects of the GHG Protocol.  Starting in 2026, S.B. 253 will compel ExxonMobil to supplement its speech with information ExxonMobil believes will, at best, be unnecessary and counterproductive.

5.     Enacted on the same day as S.B. 253, California's S.B. 261 requires companies doing business in the State with annual revenues over $500 million to generate speculative, forward-looking reports on climate-related business risks "in accordance with the recommended framework and disclosures contained in the Final Report of Recommendations of the Task Force on Climate-related Financial Disclosure" ("TCFD") or a framework that incorporates the TCFD requirements.  S.B. 261 is broader in scope than ExxonMobil's current disclosures and will require the company to engage in granular conjecture about unknowable future developments and to publicly disseminate that speculation on its website.  Furthermore, by requiring these additional mandatory disclosures, S.B. 261 is also expressly preempted by the National Securities Markets Improvement Act of 1996 ("NSMIA").

6.     Both bills require ExxonMobil to espouse California's preferred framing for issues of immense public concern.  By "[m]andating speech that [ExxonMobil] would not otherwise make" and dictating in detail the topics of the resulting mandatory reports, S.B. 253 and S.B. 261 "necessarily alter[] the content of [ExxonMobil's protected] speech," and are thus subject to strict

1  First Amendment scrutiny.  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 795
2  (1988).

3  7.  But under any level of scrutiny, no legitimate State interest justifies these speech
4  mandates.  The legislative history for S.B. 253 pays lip service to informing California
5  consumers, Senate Judiciary Committee, S.B. 253 (Wiener) (Apr. 18, 2023), but the statute's
6  reporting regime requires ExxonMobil to estimate and "recalculate" historical emissions under
7  the GHG Protocol for any business activity, anywhere on the planet—including lithium
8  production in Arkansas, jet-fuel production in Louisiana, and crude oil production in Guyana—
9  regardless of whether an ounce of those products makes its way to California consumers.  And
10  while both statutes purport to protect investors, California lacks any legitimate interest in
11  augmenting the federally regulated investor disclosures of public companies like ExxonMobil,
12  and the legislative history is bereft of clear evidence that the GHG Protocol or TCFD framework
13  would materially advance investors' assessment of ExxonMobil's business risks.  Nor does
14  California have a valid interest in compelling speech to promote viewpoints and drive public
15  opinion in a manner that it hopes will reduce greenhouse gas emissions that occur outside of its
16  borders and beyond its regulatory authority.

17  8.  While California might believe that making ExxonMobil report historical
18  emissions for an oil refinery acquired in Canada or speculative business risks for a Kazakhstan
19  pipeline is the best way to spur climate solutions, ExxonMobil disagrees.  And the First
20  Amendment bars California from pursuing a policy of stigmatization by forcing ExxonMobil to
21  describe its non-California business activities using the State's preferred framing.  Because, as
22  applied to ExxonMobil, S.B. 253 and S.B. 261 effectuate content-based speech regulation
23  divorced from any legitimate state regulatory interest, the Court should enjoin their enforcement
24  against ExxonMobil as a violation of the First Amendment.

## **PARTIES**

26  9.  Plaintiff ExxonMobil is a corporation incorporated under the laws of New Jersey
27  with its principal place of business in Spring, Texas.  With operations in more than 60 countries,
28  ExxonMobil is one of the largest integrated fuels, lubricants, and chemicals companies in the

world.  ExxonMobil's principal business involves exploration for and production of crude oil and natural gas; manufacture, trade, transport, and sale of crude oil, natural gas, petroleum products, petrochemicals, and a wide variety of specialty products; and pursuit of lower-emission and other new business opportunities, including carbon capture and storage, hydrogen, lower-emission fuels, lower-emission resins, carbon materials, and lithium.

10.    ExxonMobil does not currently explore for, produce, manufacture, or transport crude oil or natural gas in California.  It has no refining operations in California, and the vast majority of its principal business operations occur outside of California.

11.    Defendant Lauren Sanchez is sued in her official capacity as the Chair of the California Air Resources Board ("CARB").  The Chair of CARB is appointed by the Governor and serves as the "Governor's chief air quality policy spokesperson."  Cal. Health & Saf. Code § 39511(a).  S.B. 253 requires CARB to "develop and adopt regulations" that will require the covered "reporting entit[ies]" to report certain greenhouse gas emissions under the GHG Protocol, as well as "adopt regulations that authorize [CARB] to seek administrative penalties for nonfiling, late filing, or other failure to meet the requirements" of the statute.  *Id.* § 38532(c)(1), (f)(2)(A).  S.B. 261 requires CARB to collect an administrative fee from entities subject to the statute and to "adopt regulations that authorize it to seek administrative penalties" from a covered entity that fails to make the required report or publishes an inadequate report.  *Id.* § 38533(c)(2)(B)(i), (f)(2).

12.    Defendant Steven S. Cliff is sued in his official capacity as the Executive Officer of CARB.  As Executive Officer, he "shall perform and discharge, under the direction and control of [CARB], the powers, duties, purposes, functions, and jurisdiction vested in [CARB] and delegated to the executive officer by [CARB]."  *Id.* § 39515(b).

13.    Defendant Matthew Botill is sued in his official capacity as the Division Chief of the Industrial Strategies Division of CARB.  The Industrial Strategies Division of CARB has overseen the design and the rulemaking process of S.B. 253 and S.B. 261, hosting public workshops and soliciting public and stakeholder input.

14.    Defendant Dr. Sydney Vergis is sued in her official capacity as the Assistant Division Chief of the Industrial Strategies Division of CARB.

15.    Defendant Robert A. Bonta is sued in his official capacity as the Attorney General of California.  "[T]he Attorney General [is] the chief law officer of the State" of California and has "the duty . . . to see that the laws of [California] are uniformly and adequately enforced."  Cal. Const. art. 5, § 13.  S.B. 253 instructs that CARB "shall consult with . . . [t]he Attorney General" "[i]n developing the regulations" under the statute.  *Id.* § 38532(c)(2)(G)(iv)(5)(A).

## JURISDICTION AND VENUE

16.    Because this action arises under the United States Constitution, the Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  In particular, ExxonMobil seeks an "injunction[] to protect rights safeguarded by the Constitution," presenting a federal question that the federal courts have jurisdiction to resolve under 28 U.S.C. § 1331.  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010).

17.    Venue is proper in this District because at least one Defendant resides in this District, and all Defendants are residents of California.  28 U.S.C. § 1391(b)(1).  Each Defendant is an official of the State of California sued in his or her official capacity.  Upon information and belief, each Defendant discharges his or her official duties from offices in Sacramento.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims occurred in this District, as S.B. 253 and S.B. 261 were enacted by the California Legislature and signed into law by the Governor in Sacramento.  *Id.* § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A. ExxonMobil Reports Emissions and Advances Policy Views in Annual Voluntary ACS Reports**

18.    Climate change is one of the major challenges facing the world today.  So is the need to provide affordable energy and improve living standards around the world.  Since 2022, ExxonMobil's voluntary annual Advancing Climate Solutions report ("ACS Report") has publicly reported the company's progress in tackling this dual challenge, as well as its plans to reduce emissions while supporting society's growing need for reliable and affordable energy.[2]

---

[2] ExxonMobil's 2025 ACS Report is available to the general public on its website at https://corporate.exxonmobil.com/-/media/global/files/advancing-climate-

These plans include investing up to $30 billion from 2025 to 2030 in a variety of emission-reduction technologies—including carbon capture and storage, hydrogen, lower-emission fuels, and lithium—with about 65% of those investments directed toward reducing the emissions of other (non-ExxonMobil) companies.[3]  The 2025 ACS Report also details ExxonMobil's 15% reduction in operated emissions intensity—the ratio of greenhouse gas emissions to production or throughput—since 2016.[4]

19.    In addition to reporting on the company's plans and progress, the ACS Reports advocate ExxonMobil's views on energy policy.  The 2025 ACS Report, for example, "propose[s] rational and constructive policies, focused on product-level carbon-intensity standards and a well-designed carbon emissions accounting framework, that [ExxonMobil] believe[s] will, if implemented, help the world speed up a thoughtful energy transition and still meet society's needs for energy and products."[5]

20.    Central to that advocacy is ExxonMobil's critique of the GHG Protocol.  The GHG Protocol, established over 25 years ago by the World Resources Institute and the World Business Council for Sustainable Development, comprises seven standards and ten guidance documents.[6]  Its Corporate Accounting and Reporting Standard provides guidance for companies preparing a greenhouse gas emissions inventory.[7]

21.    ExxonMobil's 2025 ACS Report details the flaws with the GHG Protocol,

---

solutions/2025/advancing-climate-solutions-report.pdf [https://perma.cc/LFR9-335H] [hereinafter "2025 ACS Report"].  ExxonMobil also publishes an annual Sustainability Report, which describes ExxonMobil's approach to managing operations and its commitment to carry out business activities with sustainability in mind.  ExxonMobil's Sustainability Report is available to the general public on its website at https://corporate.exxonmobil.com/-/media/global/files/sustainability-report/2024/sustainability-report.pdf [https://perma.cc/MXA3-ME3B].
[3] 2025 ACS Report at 15.
[4] *Id.* at 7.
[5] *Id.* at 3.
[6] GHG Protocol, *Standards*, *available at* https://ghgprotocol.org/standards [https://perma.cc/L6ZL-VJJN].
[7] *See* World Business Council for Sustainable Development & World Resources Institute, The Greenhouse Gas Protocol: A Corporate Accounting and Reporting Standard 2–3 (2004), *available at* https://ghgprotocol.org/sites/default/files/standards/ghg-protocol-revised.pdf [https://perma.cc/X2SB-SV6T] [hereinafter "GHG Protocol Corporate Reporting Standard"].

including the multiple reasons why the protocol is "incapable of . . . accurate[ly] tracking . . . $CO_2$ as it moves through the economy" and thus is the "wrong tool . . . to meet society's objective of better living standards with reduced $CO_2$ emissions."[8]

22.    For example, as the 2025 ACS Report explains, the GHG Protocol "fail[s] to account for the true sources of carbon emissions and their relative impact."[9]  In particular, the GHG Protocol focuses on absolute emissions—the total greenhouse gas emissions associated directly or indirectly with a particular company—and thereby minimizes reporting on carbon intensity—the greenhouse gas emissions associated with a particular unit of output.  That focus on absolute emissions precludes meaningful comparisons across companies, making a "small producer of high-emitting products . . . appear to be more efficient than a large producer of lower-emitting products."[10]  The GHG Protocol thus penalizes companies "just for being large, even if they are more efficient."[11]  Rather than encouraging companies to focus their efforts on meeting consumer demand through lower-emitting products, the GHG Protocol pressures companies— especially large companies—to cut production to reduce their GHG Protocol reporting, decreasing supply but not demand.  When less efficient companies step in to match unmet demands, the result is *increased* emissions—exactly the opposite of what a well-designed reporting framework should accomplish.[12]

23.    By contrast, a reporting framework that tracks the carbon emissions associated with each product or service would—in tandem with carbon-efficiency standards for specific products—encourage companies to meet consumer demand with lower-emissions products.[13]  As the 2025 ACS Report also explains, the GHG Protocol leads to multi-counting of emissions because it requires reporting of not only a company's own emissions ("Scope 1") but also emissions associated with its energy consumption ("Scope 2") and upstream and downstream emissions from any goods or services it consumes or sells ("Scope 3").  Because an energy

---

[8] 2025 ACS Report at 51.
[9] *Id.* at 52.
[10] *Id.* at 51.
[11] *Id.*
[12] *Id.* at 51-52.
[13] *Id.* at 52.

producer's Scope 2 emissions would be the same as its power company's Scope 1 emissions, and its Scope 3 emissions would be the same as its customers' Scope 1 emissions, the GHG Protocol produces a fundamentally distorted picture of overall emissions and cannot accurately gauge a particular company's impact on global emissions.[14]

24.    The 2025 ACS Report also critiques the GHG Protocol because the Scope 1, 2, and 3 emissions on which it focuses—and which S.B. 253 requires covered entities to report—fail to account for avoided emissions.  Avoided emissions are emissions reductions achieved through a product or service relative to the situation where that product does not exist—such as the emissions avoided when a company makes a more carbon-efficient version of an existing product.  Because various strategies for reducing societal emissions can increase a company's reported Scope 1 or Scope 2 emissions, failing to account for these avoided emissions can in fact "disincentivize the very work it should be encouraging."[15]

25.    Further, to estimate Scope 3 emissions, the GHG Protocol relies heavily on models and estimates for which companies must often use third-party information, industry averages, and proxy data lacking verifiability and auditability, forcing entities to report emissions based on uncertain or unverifiable estimates.

26.    The GHG Protocol also requires companies to "choose and report a base year for which verifiable emissions data are available" in addition to developing "a base year emissions recalculation policy[.]"[16]  This historical reporting is intended to facilitate "comparison[s] of emissions over time."[17]  To maintain "consistent tracking," reporting entities are required to recalculate base-year emissions based on "[s]tructural changes in the reporting organization that have a significant impact on the company's base year emissions," such as mergers, acquisitions, and divestments or outsourcing and insourcing of emitting activities.[18]

27.    Such recalculations implicitly acknowledge and correct for one of the downsides

---

[14] *Id.* at 51.

[15] *Id.*

[16] GHG Protocol Corporate Reporting Standard at 35.

[17] *Id.*

[18] *Id.*

of a focus on absolute emissions, and make sense only in that context. A reporting company's absolute emissions may rise or fall if they acquire or divest a subsidiary, but that does not mean that real-world emissions have increased or decreased. Accordingly, for companies that track progress by reference to absolute emissions, recalculating "base year" emissions to exclude an acquired or divested entity's emissions ensures apples-to-apples comparisons and avoids giving the appearance of emissions increases or reductions where no real-world increases or reductions occurred.

28.     By contrast, for companies that track progress by reference to carbon intensity—emissions per unit of output—recalculation serves no purpose because the divestiture (or acquisition) changes the denominator used to calculate that ratio. The GHG Protocol elsewhere acknowledges this very point, stating that absolute emissions targets have the disadvantage of requiring "base year recalculations," whereas such recalculations are "usually not required" for intensity targets.[19] Consistent with its belief that carbon intensity provides a superior metric for driving climate progress, ExxonMobil has never included base-year recalculations in its ACS Reports. For that reason, the company's assurance of compliance criteria is not listed as the GHG Protocol's Scope 1 and Scope 2 requirements, as S.B. 253 would require starting in 2026.

29.     ExxonMobil also chooses not to report on the full range of Scope 3 emissions estimates called for under the GHG Protocol. ExxonMobil provides estimates of Scope 3 emissions in alignment with Category 11 of the methodology established by Ipieca, a global nonprofit association, which contemplates accounting for products at the point of extraction, processing, or sales.[20] But it does not report on Scope 3 emissions in other categories due to limited third-party data.[21] Nor does it include within its Category 11 total estimates associated with the combustion of third-party crude or products processed from ExxonMobil's refineries, because those emissions would have been reported by the producer of those crudes or products and including them would result in double-counting.[22] Starting in 2027, S.B. 253 would penalize

---

[19] *Id.* at 76.
[20] 2025 ACS Report at 66.
[21] *Id.*
[22] *Id.*

1    that approach, requiring the company to hew to the GHG Protocol's Scope 3 requirements, report

2    Scope 3 emissions—which are simply third-party "Scope 1" emissions—for which it lacks

3    reliable data, and misleadingly double-count the emissions of other companies as its own.

**B. ExxonMobil Discloses Material Climate-Related Risk Factors in Annual Form 10-K Filings**

6        30.    Federal law requires public companies like ExxonMobil to disclose material

7    financial risks in public filings with the Securities and Exchange Commission ("SEC").[23]  Under

8    Supreme Court precedent, the standard for materiality is whether there is a substantial likelihood

9    that a reasonable investor would consider the fact important in making an investment decision, or

10   whether its disclosure would have significantly altered the total mix of information available.

11   *See, e.g.*, *Matrixx Initiatives v. Siracusano*, 563 U.S. 27, 38 (2011); *Basic Inc. v. Levinson*, 485

12   U.S. 224, 231 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

13       31.    Acknowledging "substantial uncertainties" regarding climate change,

14   ExxonMobil's most recent 10-K filing recognizes that a variety of policy responses "could

15   negatively affect our investment returns, make our hydrocarbon-based products more expensive

16   or less competitive, lengthen project implementation times, and reduce demand for hydrocarbons,

17   as well as shift hydrocarbon demand toward relatively lower-carbon alternatives."  EXXON MOBIL

18   CORP., *Annual Report (Form 10-K)*, at 4 (Feb. 19, 2025).  In particular, the report discusses the

19   potential business risks posed by governmental policies pursuing "net-zero scenarios,"

20   greenhouse gas restrictions such as cap-and-trade or carbon tax regimes, and governmental

21   policies restricting the availability of hydrocarbon products without commensurate reduction in

22   demand, while also discussing both the opportunities and risks posed by a transition to new

23   technologies and lower-emitting solutions.  *Id.* at 4-5.

24       32.    While ExxonMobil's 10-K filings disclose material climate-related financial risks

25   to ExxonMobil as a whole, ExxonMobil does not currently foresee any such risks specific to its

26   limited activities in California.

27

28

---

[23] 17 C.F.R. § 229.105.

### C. California Passes Senate Bills 253 and 261

33.     In 2023, the California Legislature passed two pieces of legislation: the Climate Corporate Data Accountability Act (S.B. 253, codified at Cal. Health & Saf. Code § 38532), and the Climate-Related Financial Risk Reporting Program (S.B. 261, codified at Cal. Health & Saf. Code § 38533).  In introducing the bills, the sponsors dubbed them the "Climate Accountability Package."[24]  As that moniker reflects, the statutes, at their core, purport to hold large companies "accountable" for climate change by forcing them to produce reports designed to elicit public disapproval.

34.     The legislative history makes these aims clear, blaming large companies for climate change and requiring them to publish reports under S.B. 253 and S.B. 261 in the hopes that they somehow will be shamed into curbing their emissions.  *See* Senate Judiciary Committee, S.B. 253 (Wiener), at 14 (Apr. 18, 2023).

35.     While the bills' supporters also gestured at protecting California consumers (for S.B. 253) and investors (for both S.B. 253 and S.B. 261), the legislative record is devoid of clearly articulated evidence that the reporting requirements will actually further those interests.  It is unclear, for example, how requiring companies to not only report worldwide greenhouse gas emissions but also "recalculate" their historical worldwide emissions under the GHG Protocol, which is subject to double-counting—including for activities with no nexus to any California transaction—furthers any legitimate interest in protecting California consumers.  Nor does the legislative history explain how a company's greenhouse gas emissions under the GHG Protocol relate to its expected stock performance, such that S.B. 253's reporting requirement could be said to protect investors.  The same is true for S.B. 261: Its legislative history fails to connect how forcing companies to recast their disclosures of climate-related financial risks in the language of the TCFD Report—for example, by requiring reports about the future performance of business strategies in the face of speculative climate scenarios—furthers any valid investor-protection

---

[24] Press Release, Office of Scott Wiener, Senator Wiener's First-In-The-Nation Climate Corporate Carbon Disclosure Bill Heads to the Governor (Sept. 12, 2023), *available at* https://sd11.senate.ca.gov/news/senator-wieners-first-nation-climate-corporate-carbon-disclosure-bill-heads-governor [https://perma.cc/EBL4-EJCQ].

1    interest.

***Senate Bill 253***

2

3       36.     S.B. 253 requires CARB to "develop and adopt regulations" compelling any

4    company with more than $1 billion in annual revenue that does any business in California to

5    "publicly disclose" its Scope 1, Scope 2, and Scope 3 greenhouse gas emissions in "conformance

6    with the" GHG Protocol.  Cal. Health & Saf. Code § 38532(c)(1), (c)(2)(A)(i).  Those regulations

7    must ensure that a "reporting entity's public disclosure maximizes access for consumers,

8    investors, and other stakeholders."  *Id.* § 38532(c)(2)(B).  Reporting entities must also "obtain[]

9    an assurance engagement, performed by an independent third-party assurance provider, of their

10   public disclosure."  Cal. Health & Saf. Code § 38532(c)(2)(F)(i).

11      37.     Consistent with the GHG Protocol, the bill defines Scope 1 emissions as "all direct

12   greenhouse gas emissions that stem from sources that a reporting entity owns or directly controls,

13   regardless of location, including, but not limited to, fuel combustion activities."  *Id.* § (b)(3).

14   Scope 2 emissions are "indirect greenhouse gas emissions from consumed electricity, steam,

15   heating, or cooling purchased or acquired by a reporting entity, regardless of location."  *Id.*

16   § (b)(4).  And Scope 3 emissions are "indirect upstream and downstream greenhouse gas

17   emissions, other than scope 2 emissions, from sources that the reporting entity does not own or

18   directly control and may include, but are not limited to, purchased goods and services, business

19   travel, employee commutes, and processing and use of sold products."  *Id.* § (b)(5).  In other

20   words, S.B. 253 requires covered companies to report not only their own emissions (Scope 1), but

21   also emissions associated with their energy consumption (Scope 2) and "upstream and

22   downstream emissions" from any goods or services they consume or sell (Scope 3).

23      38.     Those mandated reports are not limited to California business activities or products

24   a company offers for sale in the State—the statute requires covered companies to annually

25   announce "all of the reporting entity's Scope 1 emissions and Scope 2 emissions" (beginning

26   2026) as well as "its Scope 3 emissions" (beginning 2027) without regard to where in the world

27   those emissions occur or whether they involve products that make their way to California

28   markets.  *Id.* § (c)(2)(A)(i)(I), (II).

- 12 -
COMPLAINT

39.     Although CARB has not yet promulgated implementing regulations for S.B. 253, it has pledged in public workshops that the Scope 1 and 2 reporting requirements will begin in 2026, and that the Scope 3 reporting requirement will begin in 2027.[25]  The agency has yet to formalize a deadline for 2026 reporting, but at an August 2025 "virtual public workshop" led by Defendant Vergis, CARB proposed a June 30, 2026 implementation deadline for covered companies' first Scope 1 and 2 reports.[26]

40.     CARB must also adopt regulations that "authorize it to seek administrative penalties" of up to $500,000 per reporting entity "for nonfiling, late filing, or other failure to meet the requirements of" S.B. 253.  Cal. Health & Saf. Code § 38532(f)(2)(A).

41.     By its terms, S.B. 253 requires ExxonMobil to conduct and report the base-year emissions recalculations it forgoes in its ACS Reports.  The statute requires covered entities to report Scope 1, Scope 2, and Scope 3 emissions "in conformance with" the GHG Protocol.  *Id.* § (c)(2)(A)(ii).  And the GHG Protocol requires that "[c]ompanies *shall* choose and report a base year for which verifiable emissions data are available" and "*shall*" recalculate base-year emissions under certain circumstances, including structural changes in the reporting organization, such as acquisitions and divestments.[27]  S.B. 253's express mandate for ExxonMobil to "conform" its speech to the GHG Protocol would thus require it to publish "recalculated" historical emissions that it declines to publish because they further the GHG Protocol's misguided focus on absolute emissions and are wholly unnecessary for ExxonMobil's intensity-based tracking of emission progress.

42.     Further, in ExxonMobil's experience, entities that do not conduct base-year recalculations cannot obtain a limited assurance of compliance with the GHG Protocol's Scope 1 and Scope 2 requirements.  Thus, upon information and belief, ExxonMobil would have to alter its speech to "obtain an assurance engagement, performed by an independent third-party

---

[25] *See* CARB, CARB Virtual Public Workshop on S.B. 253, S.B. 261, and S.B. 219 at 1:41:07-1:41:38, *available at* https://www.youtube.com/watch?v=PF-obXuy-w4.
[26] *See* CARB, S.B. 253/261/219 Public Workshop: Regulation Development and Additional Guidance [Presentation Slides] at 34 [https://perma.cc/RJ98-PSV4].
[27] GHG Protocol Corporate Reporting Standard at 35 (emphasis added).

assurance provider" under the GHG Protocol, as S.B. 253 requires.  Cal. Health & Saf. Code § 38532(c)(1).

43.     On October 10, 2025, CARB released its "SB 253 Scope 1 and Scope 2 Greenhouse Gas (GHG) Emissions Draft Reporting Template" ("Draft S.B. 253 Template" or "Template"), as well as an accompanying guidance document, and requested public comment by October 27, 2025.[28]  Although the Draft S.B. 253 Template currently lists base-year calculations as "optional fields" for 2026, CARB's guidance explicitly states that the Template "does not modify, replace, or supersede the statutes."[29]  S.B. 253 requires compliance with the GHG Protocol's Scope 1 and Scope 2 requirements beginning in 2026—and includes no carveout for base-year recalculations.  Thus, ExxonMobil may be required to report base-year emissions— including any recalculations required under the GHG Protocol standards—to comply with S.B. 253.  And the Template explicitly states that CARB may make optional fields—such as the "base year" fields—"required" in future reporting years.[30]

44.     The Template also appears to contemplate numerous additional reporting categories that go beyond the GHG Protocol's requirements.  To take just a few examples, the Template contemplates detailed disaggregation of emissions data by both emissions source and individual greenhouse gas species.[31]  This goes beyond the GHG Protocol, which requires reporting of emissions only by material greenhouse gas species in aggregate form.  Additionally, the Template contemplates reporting Scope 1 and Scope 2 emissions intensity in terms of emissions per million dollars of revenue (rather than emissions per unit of throughput or production), which diverges from the GHG Protocol, and is particularly problematic for sectors

---

[28] CARB, SB253 Draft Scope 1 and Scope 2 Greenhouse Gas (GHG) Emissions Template, *available at* https://ww2.arb.ca.gov/sites/default/files/2025-10/SB253_Draft_Scope1_2_GHG_Template.xlsx [https://perma.cc/E54R-TCDE].

[29] CARB, California Corporate Greenhouse Gas Reporting Program: Scope 1 and Scope 2 Emissions Draft Reporting Template (Oct. 10, 2025), *available at* https://ww2.arb.ca.gov/sites/default/files/2025-10/Draft%20Memo_Scope1%262TemplatePublicRelease.pdf [https://perma.cc/3VEG-RL74].

CARB, SB253 Draft Scope 1 and Scope 2 Greenhouse Gas (GHG) Emissions Template, *available at* https://ww2.arb.ca.gov/sites/default/files/2025-10/SB253_Draft_Scope1_2_GHG_Template.xlsx.

[31] *Id.*

1   exposed to volatile commodity pricing, such as oil and gas, where revenue fluctuations can distort

2   emissions intensity trends and undermine cross-sector comparability.  Although the guidance

3   document indicates that the Template is "voluntary for the 2026 reporting cycle," this implies that

4   CARB may make the Template—or something similar—mandatory.[32]  Thus, there is every

5   reason to expect that CARB will engage in future micromanagement of ExxonMobil's speech

6   even beyond the requirements of the GHG Protocol.

7                                    ***Senate Bill 261***

8         45.     Beginning January 1, 2026, S.B. 261 requires any company with annual revenues

9   exceeding $500 million that does any business in California to "make available to the public, on

10   its own internet website," a "climate-related financial risk report" detailing both its "climate-

11   related financial risk, in accordance with the recommended framework and disclosures contained

12   in the Final Report of Recommendations of the [TCFD] (June 2017) published by the Task Force

13   on Climate-related Financial Disclosures," and its "measures adopted to reduce and adapt to [that]

14   climate-related financial risk."  Cal. Health & Saf. Code §§ 38533(b)(1)(A), (c)(1).  A "climate-

15   related financial risk" is defined as "material risk of harm to immediate and long-term financial

16   outcomes due to physical and transition risks."  *Id.* § 38533(a)(2).

17         46.     The framework laid out in the TCFD Report is structured around "recommended

18   disclosures" in four thematic areas: governance, strategy, risk management, and metrics and

19   targets.[33]  It calls for a reporting organization to describe its board's oversight of climate-related

20   risks and opportunities; to identify short-term, medium-term, and long-term climate risks and

21   forecast those risks' impacts on its business strategy; to detail the organization's processes for

22   identifying, assessing, and managing climate-related risks; and to specify the metrics and targets

23   it uses to assess and manage relevant climate-related risks and opportunities.[34]  As part of these

24

25   [32] CARB, California Corporate Greenhouse Gas Reporting Program: Scope 1 and Scope 2
     Emissions Draft Reporting Template (Oct. 10, 2025), *available at* https://ww2.arb.ca.gov/sites/de
26   fault/files/2025-10/Draft%20Memo_Scope1%262TemplatePublicRelease.pdf.
27   [33] TCFD, FINAL REPORT: RECOMMENDATIONS OF THE TASK FORCE ON CLIMATE-RELATED
     FINANCIAL DISCLOSURES 14 fig. 4 (2017) [https://perma.cc/K995-LXUF] [hereinafter "TCFD
28   Report"].
     [34] *Id.*

disclosures, the TCFD Report recommends that organizations speculate about the future "resilience of the organization's strategy" under different hypothetical "climate-related scenarios," and asks organizations to set and publish "key climate-related targets such as those related to GHG emissions, water usage, energy usage, etc."[35]  While ExxonMobil's 2025 ACS Report "contains terms used by the TCFD" and disclosures "consistent with the recommendations of the TCFD," ExxonMobil explains that it does not purport to comply with any specific recommendation under the voluntary TCFD framework or obligate itself to use any terms in the way defined by the TCFD.[36]

47.    The statute purports to give reporting entities the choice to prepare their required reports pursuant to either (1) the TCFD or (2) an "equivalent reporting requirement," as defined in the statute.  *Id.* § 38533(b)(1)(A)(i).  But that choice is illusory.  Under the statute, there are only two ways to satisfy an "equivalent reporting requirement."  *First*, reporting entities may publish reports pursuant to a law, regulation, or listing requirement "incorporating disclosure requirements consistent with" the TCFD, such as "the International Financial Reporting Standards ['IFRS'] Sustainability Disclosure Standards."  Cal. Health & Saf. Code § 38533(b)(3)(A).  The IFRS standards "fully incorporate[]" the TCFD standards.[37]  *Second*, reporting entities may voluntarily use a framework that meets the requirements of either the TCFD or the IFRS.  *Id.* § 38533(b)(3)(B).  In other words, all "options" require ExxonMobil to speak under the requirements of the TCFD.

48.    Federal law already requires public companies like ExxonMobil to detail all material financial risks, including those associated with climate, in annual SEC filings.[38]  But S.B. 261 goes well beyond that existing obligation by requiring covered companies to create and publicly disclose a detailed, speculative risk report under the TCFD framework—as well as

---

[35] *Id.* at 23.
[36] 2025 ACS Report at 69.
[37] INT'L FINANCIAL REPORTING STANDARDS, *ISSB and TCFD*, *available at* https://www.ifrs.org/sustainability/tcfd/.
[38] *See* Comm'n Guidance Regarding Disclosure Related to Climate Change, SEC Interpretative Release No. 33-9106 (Feb. 2, 2010), *available at* https://www.sec.gov/files/rules/interp/2010/33-9106.pdf.

account for any measures the company is taking to "reduce and adapt to" those risks.  Cal. Health & Saf. Code § 38533(b)(1)(A).  And if any "required disclosures" are absent from the report, the reporting entity must "provide a detailed explanation for any [alleged] reporting gaps, and describe steps the covered entity will take to prepare complete disclosures."  *Id.* § 38533(b)(1)(B).  Thus, S.B. 261 deprives ExxonMobil of the option not to speak on any of the speculative topics laid out in the TCFD framework.  Even if ExxonMobil would prefer not to publish various "climate-related targets" or opine on various "climate-related scenarios," it will be required to explain why not, and describe what "steps" it is taking to plug those alleged "reporting gaps."

49.    S.B. 261 requires the reporting entity to report on its worldwide climate-related financial risk, not just climate-related financial risks for its California operations.  As a California Assembly Natural Resources Committee report on the bill put it, "SB 261 would require more than 10,000 companies with annual revenues exceeding $500 million to detail how climate change poses financial risks to their operations, not just in California, but around the world."  *See* Ass. Nat. Res. Comm., Analysis of S.B. 261 (2023-2024 Reg. Sess.) July 10, 2023, at 6.

50.    S.B. 261 directs CARB to adopt regulations that authorize it to "seek administrative penalties" from any covered entity that fails to make the required report publicly available on its website, or that publishes "an inadequate or insufficient report."  Cal. Health & Saf. Code § 38533(f)(2).  Such administrative penalties may be in an amount of up to $50,000 per reporting entity.  *Id.*

51.    CARB has hosted public workshops and solicited public stakeholder input on the rulemaking process under S.B. 253 and S.B. 261, and is currently proposing issuing a Notice of Proposed Rulemaking in the first quarter of 2026.[39]

**D. ExxonMobil Seeks Guidance from CARB**

52.    On September 5, 2025, ExxonMobil sent a letter to Defendant Vergis at CARB.  In that letter, ExxonMobil outlined its disagreements with the accuracy of the GHG Protocol and TCFD Report and proposed an alternative means of S.B. 261 compliance consistent with the

---

[39] CARB, *California Corporate Greenhouse Gas (GHG) Reporting and Climate Related Financial Risk Disclosure Programs - Resources*, *available at* https://ww2.arb.ca.gov/our-work/programs/corporate-ghg-reporting/resources.

1   company's current disclosures.  CARB has not responded to ExxonMobil's letter.

2   **E.  Senate Bill 253 and Senate Bill 261 Unconstitutionally Compel Protected Speech**

3       1.  Senate Bill 253 and Senate Bill 261 Are Content-Based Speech Regulations
4          Subject to Strict Scrutiny

5       53.  "[C]limate change" is a "controversial" and "sensitive political topic" occupying

6   "the highest rung of the hierarchy of First Amendment values and merits special protection."  *See*

7   *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 585 U.S. 878, 913-14 (2018).  S.B.

8   253 and S.B. 261 will compel ExxonMobil to engage in speech on that subject by describing its

9   greenhouse gas emissions and climate-related financial risks using frameworks with which it

10  fundamentally disagrees.  Such content-based speech regulations are "presumptively

11  unconstitutional" and subject to strict scrutiny under the First Amendment.  *Nat'l Inst. of Family*

12  *& Life Advocs. v. Becerra* (*NIFLA*), 585 U.S. 755, 66-67 (2018).

13      54.  Both statutes engage in "content-based regulation of speech" by "[m]andating

14  speech" that ExxonMobil "would not otherwise make," thereby "necessarily alte[ring] the content

15  of [its] speech."  *Riley*, 487 U.S. at 795.  These content-based regulations are "presumptively

16  unconstitutional and may be justified only if the government proves that they are narrowly

17  tailored to serve compelling state interests."  *NIFLA*, 585 U.S. at 766 (quoting *Reed v. Town of*

18  *Gilbert*, 576 U.S. 155,163 (2015)).  That is true regardless of whether the compelled speech is

19  deemed to consist of "opinions" or "facts," as "either form of compulsion burdens protected

20  speech."  *Riley*, 487 U.S. at 797-98.

21      55.  S.B. 253 and S.B. 261 also regulate the viewpoint of ExxonMobil's speech.  To

22  comply with S.B. 253, ExxonMobil will have to produce greenhouse gas emissions reports based

23  on a framework (the GHG Protocol) that ExxonMobil has consistently criticized as misleading

24  and counterproductive.  ExxonMobil has long maintained that the GHG Protocol's focus on

25  absolute emissions penalizes larger, carbon-efficient companies and incentivizes them to focus on

26  reducing supply rather than emissions efficiency, while double- or triple-counting many

27  emissions using unverifiable methodologies that obscure more than they illuminate.  ExxonMobil

28  has accordingly declined to adopt the GHG Protocol in full in its own voluntary reporting,

1    including by not "recalculating" base-year emissions and not reporting on the full range of Scope

2    3 emissions that would be required under the GHG Protocol.  Yet S.B. 253 will force

3    ExxonMobil to adopt the GHG Protocol in full—impermissibly "recast[ing] its [emissions

4    reporting] practices" in terms "prescribed by the State," and thus forcing ExxonMobil to

5    "implicitly opin[e] on . . . how" emissions should be reported and assessed.  *X Corp. v. Bonta*,

6    116 F.4th 888, 901 (9th Cir. 2024).

7         56.    S.B. 261 likewise requires ExxonMobil to recast its descriptions of business risk

8    using a state-prescribed framework that ExxonMobil believes is fundamentally unsuitable for

9    mandatory reporting.  *Id.*  It will be forced to "creat[e] and disclos[e] . . . highly subjective

10   opinions" about numerous speculative topics, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1122

11   (9th Cir. 2024), such as the "resilience of [its climate] strategy" in light of a variety of

12   hypothetical "climate-related scenarios."[40]  And it will be asked to set and publish "key climate-

13   related targets such as those related to GHG emissions, water usage, energy usage, etc.," thus

14   "implicitly opining on" which targets are important.[41]  *X Corp.*, 116 F.4th at 901.

15        57.    S.B. 253 and S.B. 261 are all the more suspect because they compel speech only

16   by companies above a certain annual revenue threshold.  The Supreme Court's controlling First

17   Amendment "precedents are deeply skeptical" of laws that "distinguis[h] among different

18   speakers," requiring speech by some but not others.  *NIFLA*, 585 U.S. at 777-78 (citing *Citizens

19   United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)).  Such "[s]peaker-based laws run the

20   risk that 'the State has left unburdened those speakers whose messages are in accord with its own

21   views.'"  *Id.* at 778 (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 580 (2011)).  That is the case

22   here: By forcing only large companies to submit emissions reports, the statutes burden precisely

23   those speakers most likely to disagree with the State's use of the GHG Protocol on the grounds

24   that it "penalize[s] companies just for being large, even if they are more efficient."[42]  The bills'

25   proponents openly embraced that premise, explaining that the bills target large companies

26   because large companies are "most responsible for the . . . climate crisis."  Senate Judiciary

27   _____

[40] TCFD Report at 14.

28   [41] *Id.* at 23.

[42] 2025 ACS Report at 51.

- 19 -

COMPLAINT

Committee, S.B. 253 (Wiener), at 12, 14 (Apr. 18, 2023).  As is often the case, these laws that "distinguish[] among different speakers" are "simply a means to control content."  *Citizens United*, 558 U.S. at 340.  Strict scrutiny governs California's discriminatory mandate for companies like ExxonMobil to speak in service of a state-preferred viewpoint blaming them for climate change.

2.   <u>The Speech at Issue Is Not "Commercial Speech" Entitled to Relaxed Scrutiny</u>

58.    The speech mandated by S.B. 253 and S.B. 261 is not commercial speech entitled to a lesser degree of constitutional scrutiny.  None of the required speech would "propose a commercial transaction."  *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001).  The reports the statutes require are not advertisements, do not relate to any specific product or service, and are motivated by statutory command, not economic gain.

59.    Rather, the required speech is "inextricably intertwined" with expression about issues of public concern.  *Riley*, 487 U.S. at 796; *see Nike, Inc. v. Kasky*, 539 U.S. 654, 677-79 (2003) (Breyer, J., dissenting from dismissal of writ of certiorari as improvidently granted) (explaining that commercial aspects of letter from Nike were inextricably intertwined with noncommercial speech where letter "concern[ed] a matter . . . of significant public interest and active controversy" and sought to "convey information to a diverse audience, including individuals [interested in a] public controversy surrounding Nike" (quotations omitted)).  The mandated reports will be directed at the public and will directly implicate controversial debates over, for example, how to measure greenhouse gas emissions, what reporting protocols provide the most meaningful and accurate information to the public, and what reporting standards best incentivize behavior that will effectively combat climate change.  And the bills' proponents make no bones that their goal is not to regulate transactions but to "embarrass[]"[43] the reporting companies into "tak[ing] meaningful steps to reduce GHG emissions."  Senate Judiciary Committee, S.B. 253 (Wiener), at 12 (Apr. 18, 2023).

60.    Nor do the statutes mandate disclosure of "purely factual and uncontroversial

---

[43] Remarks of Sen. Wiener, Sen. Env'l Quality Comm. Hearing on S.B. 253 (Mar. 15, 2023), *available at* http://tinyurl.com/yf66mbdn (at 2:23:37–2:23:47).

1  information about the terms under which [ExxonMobil's] services will be available." *Zauderer v.*

2  *Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985).  Describing emissions and climate

3  risks using the government's preferred framework is not "factual and uncontroversial," *id.*, but

4  instead requires ExxonMobil to "implicitly opin[e] on whether and how" those emissions and

5  risks should be described, *X Corp.*, 116 F.4th at 901.  And reporting and "recalculating" those

6  emissions and risks on a worldwide basis does far more than state "the terms under which"

7  ExxonMobil's products and "services will be available"—in California or anywhere else.

8  *Zauderer*, 471 U.S. at 651; *see Am. Meat Inst. v. U.S. Dep't of Agric.*, 760 F.3d 18, 26 (D.C. Cir.

9  2014) ("Of course to match *Zauderer* logically, the disclosure mandated must relate to the good

10  or service offered by the regulated party …."); *CTIA – The Wireless Ass'n v. City of Berkeley*,

11  928 F.3d 832, 845 (9th Cir. 2019) ("[T]he Court in *NIFLA* required that the compelled speech

12  relate to the product or service that is provided by an entity subject to the requirement.").

13          3.  Regardless of the Level of Scrutiny, Senate Bill 253 and Senate Bill 261 Are
              Unconstitutional as Applied to ExxonMobil

14

15          61.  California has no constitutionally adequate justification for the speech burdens

16  S.B. 253 and S.B. 261 impose.  Under the two bills, ExxonMobil will be forced to speak in terms

17  the company fundamentally disagrees with.

18          62.  The State has argued that S.B. 253 and S.B. 261 serve three government interests:

19  (1) to protect California "investors, consumers, and other stakeholders from fraud or

20  misrepresentation"; (2) to provide "reliable information that enables investors and consumers to

21  make informed judgments about the impact of climate-related risks on their economic choices";

22  and (3) to potentially "encourage companies doing business in California to reduce their

23  emissions and thereby mitigate" risks associated with climate change.  Defs.' Opp. to Pls.' Mot.

24  for Prelim. Inj. at 16-18, *U.S. Chamber of Com., et al. v. Randolph, et al.*, No. 2:24-cv-00801

25  (C.D. Cal. Apr. 7, 2025).  Under any applicable standard, none of those interests justifies the

26  statutes' sweeping speech restrictions as applied to ExxonMobil.

27          63.  ***Consumer Protection* (S.B. 253).**  The State asserts that forced reporting under

28  S.B. 253 protects California consumers from "fraud or misrepresentation."  *Id.*  To the best of

1  ExxonMobil's knowledge, no California official has ever suggested that the emissions

2  ExxonMobil has disclosed are misleading under any California law.  And S.B. 253's legislative

3  history fails to adequately explain how the statute's mandate would be narrowly tailored to cure

4  consumer deception.  Nor could it: Requiring ExxonMobil to describe emissions—or recalculate

5  historical emissions—from a natural gas project in Papua New Guinea in state-preferred terms

6  advances no legitimate California interest in protecting purchasers of Mobil-branded motor oil.

7  In commanding ExxonMobil to speak about that and countless other business activities with no

8  nexus to any California consumer transaction, S.B. 253 impermissibly "regulate[s] expression in

9  such a manner that a substantial portion of the burden on speech does not serve to advance its

10  goals." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Ward v. Rock Against Racism*,

11  491 U.S. 781, 799 (1989)).

12      64.    That vastly overinclusive mandate is all the more ill-fitting because California law

13  gives both the State and private individuals ample remedies against consumer deception.  *See,*

14  *e.g.*, Cal. Bus. and Professions Code § 17204.  The availability of "numerous and obvious less-

15  burdensome alternatives" to S.B. 253's speech mandate confirms that "the 'fit' between ends and

16  means is" not "reasonable."  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417

17  n.13 (1993).

18      65.    ***Investor Protection* (S.B. 253 and S.B. 261).**  Nor can the State justify S.B. 253's

19  and S.B. 261's mandates by pointing to the interests of ExxonMobil investors.  Federal law

20  already requires publicly held companies like ExxonMobil to annually report all material business

21  risks to their investors.  *See* 17 C.F.R. § 229.105.  And the National Securities Markets

22  Improvement Act of 1996 ("NSMIA") expressly preempts state laws imposing additional

23  investor-disclosure obligations on publicly held companies.  *See* 15 U.S.C. § 77r(a) ("no law . . .

24  of any State . . . (2) shall directly or indirectly prohibit, limit, or impose any conditions upon the

25  use of . . . (B) any proxy statement, report to shareholders, or other disclosure document relating

26  to a covered security").  With very limited exceptions not applicable here, that prohibition

27  forecloses California from requiring publicly held companies to make additional investor

28  disclosures beyond those required by federal law.  It thus negates any investor-protection interest

California could assert in forcing a publicly held company like ExxonMobil to make burdensome disclosures with which it disagrees or which it would not otherwise make.

66.    Further, even if California could assert a legitimate investor-protection interest in mandating disclosures from ExxonMobil, S.B. 253 and S.B. 261 would not be narrowly tailored to advance that interest.  As federal law requires, ExxonMobil already discloses that it would face business risks from climate-related regulatory interventions such as cap and trade regimes, carbon taxes, carbon-based import duties, minimum renewable usage requirements, restrictive permitting, increased mileage and other efficiency standards, mandates for sales of electric vehicles, mandates for use of specific fuels or technologies, and other incentives or mandates designed to support a transition to lower-emission energy sources.  EXXON MOBIL CORP., *Annual Report (Form 10-K)*, at 4-5 (Feb. 19, 2025).  Forcing ExxonMobil to report and recalculate absolute Scope 1, 2, and 3 emissions under the GHG Protocol (S.B. 253) or to opine on the "resilience" of its climate strategies under various hypothetical climate scenarios (S.B. 261) would not further any conceivable investor interest, but would serve only to compel speech in conformance with California's views on climate change.  *See NIFLA*, 585 U.S. at 777 (speech mandate unduly burdened protected speech where it applied to covered facilities "no matter what the facilities say on site or in their advertisements").

67.    As numerous law and finance professors put it in comments on the SEC's proposal for mandatory climate-related disclosure rules for public companies, emissions reporting measures "a company's contribution to climate change," not "the impact of climate change on the company."[44]  Thus, the "clear purpose (and certain effect)" of such reporting requirements is to "give third parties information for use in their campaign to reduce corporate emissions, regardless of the effect on investors."[45]  It may be the case that some California investors harbor ideological preferences about corporate greenhouse gas emissions that are served by California's forced-speech regime—just as they may have ideological preferences about corporate stances on a wide

---

[44] Letter to SEC from Twenty-Two Law and Finance Professors (corresponding author Lawrence A. Cunningham) (June 17, 2022), at 2, *available at* https://www.sec.gov/comments/s7-10-22/s71022-20132133-302619.pdf.

[45] *Id.* at 3.

1  range of social or political issues.  But the First Amendment forbids California from compelling

2  speech to serve ideological goals, whether of certain investors or other constituencies.

3      68.    ***Emissions Reduction* (S.B. 253 and S.B. 261)**.  Nor can California's interest in

4  emissions reductions justify the statutes' burdens on speech.  To start, California's interest in

5  regulating greenhouse gas emissions stops at its borders.  ExxonMobil engages in negligible

6  greenhouse gas emitting business activities in California.  Accordingly, as applied to

7  ExxonMobil, S.B. 253's and S.B. 261's speech mandates could serve a purported emissions-

8  reduction function ***only*** by influencing ExxonMobil business activities outside the State.  The

9  First Amendment recognizes no valid state interest in regulating ExxonMobil's speech to

10  extraterritorially regulate its non-California activities.  *See Bigelow v. Virginia*, 421 U.S. 809,

11  827-28 (1975) ("[Virginia's] interest in shielding its citizens from information about activities

12  outside [its] borders . . . that Virginia's police powers do not reach [is] entitled to little, if any,

13  weight . . . .").

14      69.    Further, while California's interest in reducing emissions is legitimate, the First

15  Amendment bars it from pursuing that interest by speech restrictions intended to shape public

16  opinion and advance the State's ideological preferences.  That is precisely what the statutes seek

17  to do.  The sponsors of S.B. 253 expressly argued that large companies subject to their reporting

18  requirements are the ones "most responsible for the . . . climate crisis."  Senate Judiciary

19  Committee, S.B. 253 (Wiener), at 14 (Apr. 18, 2023).  And the statutes require those companies

20  to generate and publish detailed reports in the hopes that "the knowledge that their emissions will

21  be publicly available might encourage them to take meaningful steps to reduce GHG emissions."

22  *Id.* at 12.  As S.B. 253's author put it, the bill forces companies to make pronouncements "they

23  don't want to" make because "they think they're going to be embarrassed by it."[46]  No matter

24  how weighty the State's ultimate objective, there is no legitimate interest in speech regulations

25  designed to shape public opinion and shame private parties disfavored by the State.  California

26  may believe that large companies with high absolute emissions are uniquely responsible for

27

28  [46] Remarks of Sen. Wiener, Sen. Env'l Quality Comm. Hearing on S.B. 253 (Mar. 15, 2023),
*available at* http://tinyurl.com/yf66mbdn (at 2:23:37–2:23:50).

climate change regardless of how efficiently they meet market demands; but the First Amendment categorically bars it from forcing ExxonMobil to speak in service of that misguided viewpoint. *See W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.").

70.     ExxonMobil already provides robust reporting on the very issues encompassed by S.B. 253 and S.B. 261 in its ACS and required SEC reporting, respectively.  This reporting is publicly available to all stakeholders worldwide, including those in California.  There is no legitimate reason to require ExxonMobil to produce additional reports beyond what it already produces other than to force ExxonMobil to align with California's views on climate change.

## FIRST CLAIM FOR RELIEF

**(Violation of the First Amendment, as Incorporated Against the States Through the Fourteenth Amendment Under 42 U.S.C. § 1983 and *Ex Parte Young* – S.B. 253)**

71.     ExxonMobil realleges paragraphs 1 through 71 and incorporates them by reference, as though fully set forth herein.

72.     The First Amendment to the U.S. Constitution provides that the government "shall make no law . . . abridging the freedom of speech."  U.S. Const. amend. I.  "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."  *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 816 (2000).

73.     The First Amendment protects "both the right to speak freely and the right to refrain from speaking at all."  *Wooley*, 430 U.S. at 714.  "For corporations as for individuals, the choice to speak includes within it the choice of what not to say."  *Pac. Gas & Elec. Co.*, 475 U.S. at 16 (plurality opinion).  A statute that "[m]andat[es] speech that a speaker would not otherwise make necessarily alters the content of the speech," regardless of whether the statute compels "statements of opinion" or "statements of 'fact.'"  *Riley*, 487 U.S. at 795, 797-98.  S.B. 253 is such a "content-based regulation," and is "presumptively unconstitutional and may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests,"

1  *NIFLA*, 585 U.S. at 766 (quoting *Reed*, 576 U.S. at 163).

2  74.    S.B. 253, as applied to ExxonMobil, violates the company's First Amendment

3  rights because it compels ExxonMobil to produce reports on a topic of intense political debate

4  that it would otherwise not produce and with which it fundamentally disagrees.  The reporting

5  required under S.B. 253 must be "in conformance with" the complete GHG Protocol, a flawed

6  reporting standard with which ExxonMobil has expressed strenuous disagreement.  S.B. 253 will

7  thus force ExxonMobil to adopt the portions of the GHG Protocol it has declined to adopt in its

8  voluntary reporting, such as the requirement to publish base-year emissions recalculations and the

9  requirement to report the full range of Scope 3 emissions.

10  75.    S.B. 253 is not narrowly tailored to any compelling State interest.  And while there

11  is no basis to apply a more relaxed form of First Amendment scrutiny, the bill would violate the

12  First Amendment under any level of scrutiny, as the bill's speech mandate is not reasonably

13  related to any substantial government interest, and is unjustified and unduly burdensome.

14  **SECOND CLAIM FOR RELIEF**

15  **(Violation of the First Amendment, as Incorporated Against the States Through the**

16  **Fourteenth Amendment Under 42 U.S.C. § 1983 and *Ex Parte Young* – S.B. 261)**

17  76.    ExxonMobil realleges paragraphs 1 through 76 and incorporates them by

18  reference, as though fully set forth herein.

19  77.    S.B. 261, as applied to ExxonMobil, violates the company's First Amendment

20  rights because it compels ExxonMobil to form and publish speculative, highly subjective opinions

21  where it would "prefer to remain silent." *Pac. Gas & Elec. Co.*, 475 U.S. at 18 (plurality

22  opinion).

23  78.    S.B. 261 requires ExxonMobil to make public statements estimating its climate-

24  related financial risk beyond what ExxonMobil already reports and is required by the SEC.

25  Under the TCFD framework required by S.B. 261, ExxonMobil will be forced to "creat[e] and

26  disclos[e] . . . highly subjective opinions" about numerous speculative topics, *NetChoice*, 113

27  F.4th at 1122, such as the "resilience of [its climate] strategy" in light of a variety of hypothetical

28  "climate-related scenarios."  And it will be forced to "implicitly opin[e]" on a range of other

controversial topics, *X Corp.*, 116 F.4th at 901, such as which scenarios are plausible and relevant

to its circumstances and the relative likelihood and imminence of various climate-related risks.

Such required disclosures will fundamentally "alter[] the content of [ExxonMobil's] speech."

*Riley*, 487 U.S. at 795.

79.     S.B. 261 is not narrowly tailored to any compelling State interest.  And while there

is no basis to apply a more relaxed form of First Amendment scrutiny, the bill would violate the

First Amendment under any level of scrutiny, as the bill's speech mandate is not reasonably

related to any substantial government interest, and is unjustified and unduly burdensome.

## THIRD CLAIM FOR RELIEF

### (Violation of the Supremacy Clause Under *Ex Parte Young* – S.B. 261)

80.     ExxonMobil realleges paragraphs 1 through 80 and incorporates them by

reference, as though fully set forth herein.

81.     The National Securities Markets Improvement Act ("NSMIA") expressly preempts

all state laws that "directly or indirectly prohibit, limit, or impose any conditions upon the use of

. . . any proxy statement, report to shareholders, or other disclosure document relating to a

covered security . . . that is required to be and is filed with the [Securities and Exchange]

Commission."  15 U.S.C. § 77r(a)(2)(B).  With limited exceptions not applicable here, that

provision bars states from imposing enhanced investor reporting requirements—beyond the

reports federal law already requires public companies to file with the SEC—concerning "covered

securities."

82.     ExxonMobil's securities, including its publicly held stock and its bonds, are

"covered securities" within the meaning of 15 U.S.C. § 77r(b).  And ExxonMobil annually

discloses all material business risks—including climate-related risks—in Form 10-K filings that

are "required to be and [are] filed with the Commission."  *Id.*  But S.B. 261 would impose

additional investor reporting requirements on ExxonMobil.  Federal law simply requires

ExxonMobil to disclose information if there is a substantial likelihood a reasonable investor

would consider it important or its disclosure would significantly alter the total mix of information

available.  By contrast, S.B. 261 would ask ExxonMobil to provide investors with highly granular

risk information on a number of subjects, including speculative projections about the resilience of its climate strategies in various hypothetical climate-change scenarios. The NSMIA preempts S.B. 261 from imposing those augmented risk disclosures on an issuer of covered securities such as ExxonMobil.

## FOURTH CLAIM FOR RELIEF

### (Attorneys' Fees and Costs Under 42 U.S.C. §§ 1983 and 1988)

83.    ExxonMobil realleges paragraphs 1 through 83 and incorporates them by reference, as though fully set forth herein.

84.    Under 42 U.S.C. § 1988(b), "[i]n any action or proceeding to enforce" 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of [its] costs." Additionally, the court "may include expert fees as part of the attorney's fee." 42 U.S.C. § 1988(c).

85.    ExxonMobil is entitled to reasonable attorneys' fees, including expert fees and other costs, in this action.

## PRAYER FOR RELIEF

86.    For these reasons, ExxonMobil respectfully requests that the Court:

a.    Declare that S.B. 253 violates the First Amendment of the U.S. Constitution as applied to ExxonMobil;

b.    Declare that S.B. 261 violates the First Amendment of the U.S. Constitution as applied to ExxonMobil;

c.    Declare that S.B. 261 is preempted by the NSMIA;

d.    Enjoin the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 253 against ExxonMobil;

e.    Enjoin the Defendants from implementing, applying, or taking any action whatsoever to enforce S.B. 261 against ExxonMobil;

f.    Award to ExxonMobil reasonable attorneys' and experts' fees incurred in bringing this action under 42 U.S.C. § 1988; and

g.    Grant such other and further relief as this Court deems just and proper.

Dated:  October 24, 2025                    O'MELVENY & MYERS LLP


                                            By: */S/ Jonathan P. Schneller*
                                                DAWN SESTITO
                                                JONATHAN P. SCHNELLER
                                                LAUREN KAPLAN
                                                400 South Hope Street, Suite 1900
                                                Los Angeles, California  90071-2811
                                                Telephone: (213) 430-6000
                                                Facsimile:  (213) 430-6407

                                                *Counsel for Plaintiff Exxon Mobil*
                                                *Corporation*

COMPLAINT